**William H. WHITE, d/b/a Southern Investment Company, Plaintiff-Appellee,**

v.

**Lofton A. PHILLIPS, Defendant-Appellant.**

**No. 80–7689.**

United States Court of Appeals, Fifth Circuit.*

Unit B

June 16, 1982.

---

7. *Id.* at 408.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

liam White for $39,090.92 plus attorney's fees and interest. The court held Lofton Phillips liable for that amount as a compensated surety. Because White's claims are within the scope of Phillips' "guaranty,"[1] we affirm.

*Facts*

Mr. and Mrs. Phillips became acquainted with R. C. Shumpert as a member of their church. Mr. Shumpert had spent "all of his adult life" in the van lines business. He approached the Phillipses and asked for their assistance in putting together a "real good working company." On the basis of their friendship (and apparently Mr. Shumpert's experience in the field), Mr. Phillips invested $50,000 in the enterprise in exchange for 48% ownership. Mr. Shumpert held the remaining, controlling interest and managed R. C. Van Lines. Although Mr. Phillips was vice president, he only "dropped in occasionally."

In the summer of 1977, R. C. Van Lines was doing poorly. Like many similar companies, most of its business came from government contracts. Unlike private parties who have to pay before a shipment is delivered, the United States pays its obligations with all the speed one might expect of a cumbersome bureaucracy. In order to improve cash flow, R. C. Van Lines, like many other carriers, factored its accounts receivable. Under this business procedure, the factor pays the carrier the face value of the account less a discount. A factor's key to profit-making is his correct estimation of the delay between his purchase of the account and its payment. If the period is short, the cost of money (which the factor borrows in part to buy the accounts) will be less than the amount of the discount and a profit will result. In 1977, R. C. Van Lines had a factoring arrangement with a 5% discount.

In the summer of 1977, White (Southern Investment) and Shumpert discussed a prospective factoring arrangement at a more favorable discount rate. At a meeting held

Fletcher Thompson & Associates, Mark C. Ellison, Fletcher Thompson, Atlanta, Ga., for defendant-appellant.

Arnall, Golden & Gregory, Charles L. Gregory, Jeffrey C. Baxter, Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT, and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

After a bench trial below, the district court entered judgment on behalf of Wil-

1. We adopt the practice of the parties and refer to the document signed by Phillips as a "guaranty."

in August, White agreed to factor "Government receivables" of R. C. Van Lines at 2½% discount. Under the agreement, R. C. Van Lines assigned its accounts to White and promised to reimburse him for any amounts not paid by the government. The principals (Mr. Shumpert and Mr. Phillips) and their spouses were to sign an "Unconditional Guaranty and Indemnification Agreement." Mr. Phillips signed an agreement which provided in pertinent part:

... in consideration of SOUTHERN INVESTMENT COMPANY purchasing by assignment certain receivables of R. C. VAN LINES, INC. in an amount not to exceed five hundred thousand dollars ($500,000.00) at any given time, the undersigned hereby guarantee absolutely and unconditionally the payment by R. C. VAN LINES, INC. to SOUTHERN INVESTMENT COMPANY of any and all sums which may become due to SOUTHERN INVESTMENT COMPANY by reason of its purchase of such receivables and to further indemnify SOUTHERN INVESTMENT COMPANY against any and all claims, losses, or damages it may incur or suffer by reason of the failure of R. C. VAN LINES, INC. to perform its obligations to SOUTHERN INVESTMENT COMPANY.

The essence of the August meeting was recorded in a letter from Mr. White to the company, a copy of which Mr. Phillips received.

With reference to our meeting last Saturday, August 13, with your attorney, Mr. Fletcher Thompson, and your partner, Mr. L. A. Phillips, this is to confirm to you that Southern Investment Company would be willing to finance your U. S. Government receivables for the discount rate of 2½%. In lieu of a reserve account which is customary in this type of financing, we would accept the unconditional guaranty of you and your wife, and Mr. L. A. Phillips and his wife.

All parties concede that this is the last information provided by the principals to Mr. Phillips regarding the factoring arrangement. Within six weeks of the execution of the "guaranty," Mr. White, no longer satisfied with the bargain he had struck, advised Shumpert that the accounts were not as readily collectible as he had believed and that new terms were necessary. The new agreement is set forth in a follow-up letter from White to Shumpert.

This is to confirm our conversation as of this date whereby Southern Investment Company will be charging R. C. VAN LINES, INC. a rate of 2½% of the face amount of your Government receivables plus 2% over the prime rate charged by North Carolina National Bank, Charlotte, North Carolina, on the average outstanding balance of your account.

All parties concede that Mr. Phillips was never advised of this "new arrangement." During the remaining life of the company, interest charges amounted to $32,134.72.

In June 1978, White, anticipating the impending collapse of R. C. Van Lines, set up a reserve account in which 10% of the collected factored accounts were withheld. Over the remaining company life, $20,328.47 was withheld in the reserve account. No evidence was presented to show that Mr. Phillips was aware of this reserve account.

By White's accounting, $39,090.92 was owed by the van lines. It is important to consider how this was calculated. Initially, White would enter the value of the purchased accounts receivable in his books and disburse that amount, less 2½ percent discount to the van lines. After setting up the reserve account and making the "prime plus 2%" arrangement, the accounts were handled differently. Ten percent of the account was "held back." Effectively, the van lines would be paid the face value of the accounts receivable less 12½ percent. Ten percent of the account was then credited to the van lines in the reserve account. White charged the reserve account each month for interest due under the "prime plus 2%" agreement and for other fees related to collection. When the shipper paid on an account, that payment was credited against the accounts receivable. Because the original shipping charges were often greater than the "reasonable" charges

which the government would pay, the amount was often less than originally billed. The payment which White claimed against Phillips ($39,090.92) was the sum of the unpaid accounts less the amount remaining in the reserve accounts. Thus, White's claim includes uncollected accounts, collection expenses, and interest due under the "prime plus 2" agreement.

In June 1978, White factored an account for Omni Products. Unlike the other accounts, for which the government was primarily liable, this was a "commercial" account. The parties dispute whether it was covered by Phillips' "guaranty."

■ Phillips wages a multipronged attack on the district court's judgment for plaintiff. He asserts that he was an uncompensated surety and that the "2% over prime" arrangement was a novation, and thus he is discharged under Ga.Code Ann. § 103–202.[2] He claims that the "increase in interest" increased his risk and thus discharged him under Ga.Code Ann. § 103–203.[3] He makes the same arguments with respect to the reserve account. He contends additionally that the parties agreed only to the financing of "Government receivables" and that the Omni accounts were not within the meaning of that term. Alternately, he asserts factoring the Omni accounts increased his risk and thus discharged him under Ga.Code Ann. § 103–203. If Phillips is a compensated surety, he must rely on the common law for his defenses. In essence, he must show a novation and then demonstrate a material change yielding actual harm.

■ Unlike the parties, we do not believe this case presents complex legal issues. Mr. Phillips agreed to act as surety in exchange for Mr. White's factoring of R. C. Van Lines' accounts. He did so in a writing under which he is liable for failure of the van lines to meet its obligations to White. That liability is not limited in the writing. The van lines failed to meet its obligations and now Phillips is liable. This case is no more complex than that; Phillips is liable for White's claims that are within the scope of the agreement whether he is guaranty, compensated surety, or uncompensated surety. All of the claims are within the scope of that broad agreement. Thus, no novation occurred, no risks were increased, and no harm incurred. The parties skipped this crucial initial step in the analysis and dove into the surety/guaranty quagmire.

Phillips' arguments concerning the "2% over prime" arrangement, reserve account and the Omni accounts are based on a theory of novation. Phillips argues that his liability is limited to "all sums which may become due to Southern Investment Company by reason of its purchase of such receivables." He then contends that the guaranty is limited by White's letter agreeing "to finance your U. S. Government receivables for the discount rate of 2½%" and further stating that the guaranty agreement would substitute for a reserve account. If this were the entire agreement, Phillips' defenses would have considerable vitality. He overlooks the second part of the guaranty agreement which says:

> ... and to further indemnify SOUTHERN INVESTMENT COMPANY against any and all claims, losses, or damages it may incur or suffer by reason of the failure of R. C. VAN LINES, INC. to perform its obligations to SOUTHERN INVESTMENT COMPANY.

As can readily be seen, Mr. Phillips executed a general guaranty.

We are guided by the decision of *White v. Chapman*, 149 Ga.App. 409, 254 S.E.2d 434 (1979). The plaintiff and guaranty agree-

---

**2.** Ga.Code Ann. § 103–202 (3543) *Novation; discharge of surety*

Any change in the nature or terms of a contract is called a novation; such novation, without the consent of the surety, discharges him.

**3.** Ga.Code Ann. § 103–203 (3544) *Discharge of surety by increase of risk*

Any act of the creditor, either before or after judgment against the principal, which injures the surety or increases his risk, or exposes him to greater liability, shall discharge him; a mere failure by the creditor to sue as soon as the law allows, or neglect to prosecute with vigor his legal remedies, unless for a consideration, shall not release the surety.

ment in that case are the same as here. The defendant in that case unsuccessfully argued to the trial court that his liability:

> was limited to any liability that may arise from the seven (7) contracts assigned in [the Financing Agreement]; thus to make the sureties liable for any obligations arising out of contracts beyond the seven (7) assigned would be an increase of the risk of the sureties and an [unwarranted and impermissible] extension of the sureties liability by implication ...

\* \* \* \* \* \*

Therefore, we hold that the unconditional surety agreement embraced as a class any indebtedness arising by reason of subsequent purchases by assignment of contracts or receivables and was not limited in its scope to the seven contracts named in the financing agreement. As the contract is clear and unambiguous, no resort to rules of construction is necessary.

\* \* \* \* \* \*

> If the surety contract was intended to restrict liability to particular transactions, words to that effect should have been chosen.

*Id.* 254 S.E.2d at 437. Since there was no limitation upon Phillips' liability for any claims Southern Investment Company might have against R. C. Van Lines, Inc., principles of novation are not called into play.

Not only is such an adventure unnecessary, it makes no difference in the final outcome of the case. The significance of the surety/guaranty distinction has long been disputed.[4] Effective July 1, 1981, the Georgia General Assembly removed the distinction. Act 600 of the Georgia General Assembly on April 9, 1981 amended Georgia statutes to read:

103–101. Definition. The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal, the principal in either instance remaining bound therefor. Sureties, including those formerly called guarantors, are jointly and severally liable with their principal unless the contract provides otherwise. There shall be no distinction between contracts of suretyship and guaranty.

We need not decide whether this Act of the Georgia legislature should apply in this case. Even if this case is governed by the overdue elimination of the guaranty/surety distinction, Phillips is in no better position. There was no novation by which he could be relieved under § 103–202. Unlike a case on which a particular contract is "guaranteed," Phillips agreed to stand good for "any obligations." He did not limit his liability to the factoring terms initially agreed to. Thus, no novation occurred as the factoring arrangements varied. As to § 103–203, no actual harm need be shown (as is required under the common law), but Phillips, under his broad guaranty, was not subject to increased risk or exposed to greater liability as the statute requires for relief. Therefore, he cannot benefit under that section either under the theory that he is an uncompensated surety or that Georgia has made the statutory defenses available to surety and guaranty alike.

If Phillips was a compensated surety and former Georgia law applies, he is "discharged only if the change is material and causes some injury, loss or prejudice ...." *Brock Construction Co., Inc. v. General Ins. Co., et al.,* 144 Ga.App. 860, 243 S.E.2d 83, 86, *aff'd,* 241 Ga. 460, 246 S.E.2d 316 (1978).

---

**4.** "You can call a camel an elephant but that won't make its hump disappear." *Houston General Ins. Co., et al. v. Brock Construction Co., Inc.,* 241 Ga. 460, 246 S.E.2d 316 (1978) (Undercofler, Presiding J., concurring). *See* Kock, Security Transactions, 17 Mercer L.Rev. 225, 235–37 (1965); Kern, Guaranty and Suretyship, Distinction Without a Difference, 24 Ga. B.J. 273 (1961); Green, Distinction Between Guaranty and Suretyship in Georgia—An Effort in Equity, Effort in Futility, 2 Ga.B.J. 25 (1939); *cf.* Daykin, Guarantor Distinguished from Surety, 1 W.Res.L.Rev. 75 (1949); Radin, Guaranty and Suretyship, 17 Calif.L.Rev. 605 (1929); Restatement, Security § 82 (1941). *See also* Saunders, Contract: Surety and Guaranty Contracts—Some Problems of Draftsmanship, 1 Ga.State B.J. 522 (1965).

As indicated above, the Omni account and interest charges were "obligations" within the scope of the agreement and no change, much less material change, occurred. Therefore, under the common law, Phillips can establish no defense.

*Scope of the Agreement*

Thus, as we indicated above, these distinctions are meaningless if the claims of White are obligations of R. C. Van Lines under the agreement. The surety agreement covers "any and all claims, losses, or damages" which Southern Investment Company may incur "by reason of the failure of R. C. VAN LINES, INC., to perform its obligation to Southern Investment Company." The language is clearly broad, certainly broad enough to cover these claims.

*The Interest—Prime Plus 2 Agreement*

Phillips argues that the language of the "guaranty" indicates that the *purchase* of accounts receivable was contemplated and that "interest" may not arise from a purchase. This argument requires an overly narrow reading of this broad guaranty. We cannot ignore the clear language of the agreement. The interest charges were "obligations of R. C. Van Lines to SOUTHERN INVESTMENT COMPANY" and thus clearly covered by the agreement to "further indemnify SOUTHERN INVESTMENT COMPANY against any and all claims, losses, or damages it may incur or suffer by reason of the failure of R. C. VAN LINES, INC. to perform its obligations to SOUTHERN INVESTMENT COMPANY." R. C. Van Lines and White were free to structure the obligations in any way they chose. Likewise, Phillips was free to limit his liability to certain kinds of arrangements. *White v. Chapman,* 149 Ga. App. 409, 254 S.E.2d 434 (1979). He failed to do so and is thus liable.

*The Omni Account*

The surety agreement covered "certain receivables." Under Georgia law, Phillips should have required more restrictive language in the surety agreement if he did not wish to be held accountable for all factored accounts. *White v. Chapman, supra.* Further, as the district court found, even if "certain receivables" is an ambiguous term, Phillips did not demonstrate that he agreed only to the factoring of accounts on which the government was primarily liable. Phillips then is liable for the Omni accounts.

*The Reserve Account*

The reserve account was nothing more than an accounting tool which the van lines and White utilized in structuring their factoring arrangements. The establishment of the reserve account had no effect on the "obligations of R. C. Van Lines" and thus is not legally significant.

We AFFIRM.

GODBOLD, Chief Judge, dissenting:

I am not able to concur in the majority opinion.

It holds that R. C. Van Lines made an agreement with White (Southern Investment) to factor R. C.'s accounts receivable pursuant to which R. C. would purchase accounts at a discount. The guaranty agreement signed by Phillips is then construed and applied in the light of this hypothesis that accounts were sold.

As the district court noted, factoring can take the form of purchasing accounts receivable at a discount or lending money using accounts receivable as security for a loan. Different rights and duties may flow from the financing provided for under one of these arrangements as opposed to the other. *See* UCC § 9–102(1)(b) and Comment 2. (The usual consequences can, of course, be altered by agreement.) In this instance, arguably the original transaction was for purchase of accounts at a discount while the later transactions, after the White/Shumpert interest agreements, were secured loans. And, at least on the face of the guaranty, Phillips never agreed to guarantee obligations arising out of loan transactions. Another possibility is that, although the guaranty refers to purchases, the original agreement, as illuminated by the later transactions on which interest was charged, was for a loan/collateral arrangement.

The district court made no finding whether the original agreement was for the type of factoring that involved sales of accounts or that involving making of loans secured by the collateral of accounts. It made no finding whether the later transactions, after White began to charge interest, were loans. We do not know what conclusion the district court would have reached with respect to the meaning and scope of the guaranty if it had found that the original arrangement was for loans/collateral dealings, or, if the original arrangement was for sales/purchase dealings, whether the later transactions, when interest began to be charged, were loans.

The majority opinion leaps over these questions by stating the guaranty is unlimited in nature. I doubt it is any broader than the underlying transactions. The phrase "perform its obligations" in the last portion of the quoted part of the guaranty appearing in the majority opinion is no broader than the underlying transactions that the guaranty protects; the nature of those transactions is equivocal and not decided by the district court.

I am not unwilling to make findings of fact on appeal when the nature of the issues, the nature of the missing facts, and the state of the record permit it. This is not such a case.

I would remand to the district court for precise findings on what the parties originally agreed to, the scope of the guaranty originally, what they agreed to subsequently, and if the arrangements were amended the effect of the guaranty as applied to them.